The Honorable Jay Bradford State Senator Post Office Box 8367 Pine Bluff, AR 71611-8367
Dear Senator Bradford:
I am writing in response to your request for my opinion on two questions arising from the following recited factual background:
 The City of Pine Bluff and Jefferson County have an interlocal agreement for the provision of dispatch of emergency services (police, fire, etc.). Pursuant to the agreement, a separate legal entity was formed known as the Metropolitan Emergency Communications Association (MECA). The structure and membership of the board is detailed in the agreement which created MECA and calls for the coordinator of the Office of Emergency Services (OES) to sit as a voting member of the board of MECA. The coordinator's position is funded one-half by the county and one-half by MECA.
Against this backdrop, you have posed the following questions:
 1. Is there a conflict of interest for a MECA board member to derive one-half of his salary from MECA or other conflict of interest issue here?
 2. If so, can this be cured by the OES coordinator refraining from voting on any matter that would benefit him monetarily?
 3. Does A.C.A. § 14-42-107 affect his ability to sit as a board member?
RESPONSE
I assume from the recited factual background that your first question is directed toward the OES coordinator. In my opinion, no unlawful conflict of interest arises simply by virtue of the coordinator's receipt of one-half of his salary from MECA. I lack sufficient facts to definitively assess any other possible conflict of interest issue, although I note that the OES coordinator's position on the MECA board might give rise to a common law conflict of interest in isolated situations, requiring that he refrain from voting on particular matters, as discussed generally below. The answer to your third question is "no." Reference should, however, be made in this regard to the general county ethics provisions contained in A.C.A. § 14-14-1202.
Question 1 — Is there a conflict of interest for a MECA boardmember to derive one-half of his salary from MECA or otherconflict of interest issue here?
It is apparent from the recited factual background that this question focuses on the OES coordinator. Some explanation regarding the "coordinator" position and MECA will be helpful in understanding the issue(s) presented.
The position of "coordinator" is established under the "Arkansas Emergency Services Act of 1973" (A.C.A. § 12-75-101 et seq.). This act addresses the provision of disaster planning and emergency services within the state. It requires that each county must "establish, fund, and maintain an established local office of emergency services" or make arrangements to receive such services through an "interjurisdictional agreement." A.C.A. §12-75-118(b)(1) (Repl. 2003). Municipalities within the county receive their emergency services support from the county, unless they have been specifically designated as local emergency services offices by the Governor. Id. at (2) and (i)(1)(A). The act further provides in relevant part that a local office of emergency services shall be "under the direction and control of the appropriate chief executive[,]" who "shall appoint an emergency services coordinator . . . [who] shall act for and on behalf of the appropriate chief executive officer to manage and coordinate the functions, duties, and activities of the established local office of emergency services." A.C.A. §12-75-118(a)(2) and (i)(1)(A) and (C).
My inquiries reveal that the "OES" referenced in your question is the Jefferson County "established local office of emergency services," and that this county office serves each municipality in the county, the Governor having designated no municipal offices as contemplated by the Emergency Services Act, supra.
Accordingly, I assume that the OES coordinator was appointed by the county judge (the "appropriate chief executive"), to act on the judge's behalf in managing and coordinating the OES pursuant to the Emergency Services Act, as set out above.
With regard to "MECA" (the Metropolitan Emergency Communications Association), my inquiries reveal that this entity was created pursuant to an interlocal agreement that was entered between the City of Pine Bluff and Jefferson County to establish a "combined communications network" and to "streamline the dispatching of non-emergency and emergency calls as received over the 911 telephone system and by other means." "Interlocal Cooperation Agreement, Metropolitan Emergency Communications Association" (filed with the County Probate Clerk of Jefferson Co. on Dec. 6, 1994, No. CA 94-37; hereinafter "Agreement.") The Agreement served in effect to consolidate a 911 dispatch center for the county, to be located at the "Jefferson County Courthouse/Emergency Operations Center." Agreement at Article 2. Although it is not entirely clear from its face, the Agreement appears to be in the nature of a "mutual aid agreement" under the Arkansas Public Safety Communications Act of 1985 (A.C.A. §12-10-301 et seq.), to share services and funding of a 911 public safety communications center. See A.C.A. § 12-10-304 and — 305. See also Agreement at Art. 6 (requiring that procurement for the communications system be governed by, inter alia,
A.C.A. § 12-10-323, which is part of the Public Safety Communications Act).
Your specific question focuses on the MECA "Commission" (what you have referred to as the MECA "board"). The Commission was created by the Agreement to be comprised of the following individuals who "serve by virtue of their term in office or employment with local government" (id. at Art. 4):
1. Jefferson County Judge
2. Mayor of Pine Bluff
3. Jefferson County Sheriff
4. Chief of Pine Bluff Police Department
5. Chief of Pine Bluff Fire Department
6. OES Coordinator
7. Chairman 911 Administrative Board
Id. (emphasis added).
The Commission's purpose according to the Agreement includes assuring that the communications system is properly funded, hiring a "Communications Director" to manage the system, and setting policies, procedures, and "necessary guidelines for efficient operation of the system." Id. at Art. 5.
With this further backdrop in mind concerning MECA and the OES coordinator position, I will turn to your "conflict of interest" question. Regarding the coordinator's salary, it is my opinion that the coordinator's receipt of one-half of his salary from MECA does not give rise per se to an unlawful conflict of interest. I have no information regarding the specific source of MECA's payment, but I assume it derives in some manner from monies generated or received under the authority of the Public Safety Communications Act, supra. See A.C.A. §§ 12-10-318
through — 322 (Repl. 2003 and Supp. 2005). Such monies are properly expended for "[p]ersonnel costs, including salary and benefits, of each position charged with supervision and operation of the 911 public safety communication center and system[.]"Id. at — 323 (Repl. 2003). The coordinator holds such a position, according to my understanding, by virtue of his appointment as "Communications Director" pursuant to the Agreement wherein it provides for the hiring of a `"Communications Director' to manage the system. . . ." Agreement at art. 5. I note that the coordinator's service as Communications Director is consistent with subsection 12-10-306
of the Public Safety Communications Act, which states in relevant part:
 The staff and supervisors of the 911 public safety communications center and systems shall be . . . [p]aid employees, either sworn officers or civilians, of the operating agency designated by the chief executive of the political subdivisions.
A.C.A. § 12-10-306(a)(1) (Repl. 2003).
The definitional section of the Public Safety Communications Act states, additionally, that "[o]perating agencies are limited tooffices of emergency services, fire departments, and law enforcement agencies of the political subdivisions[.]" Id. at — 303(14)(B).[1] The OES coordinator therefore has supervisory and/or operational responsibilities with respect to the 911 communications system, and consequently may be paid in whole or in part by MECA, consistent with A.C.A. § 12-10-323,supra.
I should note, however, that the salary payment by MECA conceivably could give rise to instances implicating a common law conflict of interest. In Ark. Op. Att'y Gen. No. 1995-099, this office set forth the standard for determining whether a public officer faces a conflict of interests:
 With regard, generally, to the existence of a conflict, it has been stated that the phrase `conflict of interest,' when used to suggest disqualification of a public official from performing his or her duties, ordinarily refers to `a clash between the public interest and the private pecuniary interest of the individual concerned.' Gardner v. Nashville Housing Auth., 514 F.2d 38 (6th Cir. 1975). The `conflict of interest theory' is based `on the fact that an individual occupying a public position uses the trust imposed in him and the position he occupies to further his own personal gain. It is the influence he exerts in his official position to gain personally in spite of his official trust which is the evil the law seeks to eradicate.' City of Coral Gables v. Weksler, 164 So.2d 260, 263
(Fla.App. 1964). See also generally 63A Am. Jur. 2d Public Officers and Employees § 321 (1984).
 The furtherance of the officer's personal interest is thus the focal point of the unlawful conflict of interest theory. See Van Hovenberg v. Holman, 201 Ark. 370, 144 S.W.2d 719 (1940).
I have elaborated upon this principle as follows:
 The common law prohibition against conflicts of interest is reflected in the following description of the public policy underlying the principle:
 A public office is a public trust . . . and the holder thereof may not use it directly or indirectly for personal profit, or to further his own interest, since it is the policy of law to keep an official so far from temptation as to insure his unselfish devotion to the public interest. Officers are not permitted to place themselves in a position in which personal interest may come into conflict with the duty which they owe to the public, and where a conflict of interest arises, the office holder is disqualified to act in the particular matter and must withdraw. [Citations omitted.]
 The above-quoted policy statement concerning conflicts of interest makes clear that in situations where a common law conflict of interest is present, it may be appropriate for the affected public servant to abstain from participating in any decision-making procedure that would impact upon his or her personal interests, so as to avoid the temptation of placing his self-interest above those he was chosen to represent.
Op. Att'y Gen. 2004-160.
As a sworn public safety officer (see A.C.A. § 12-75-126 and — 127 (Repl. 2003)), the OES coordinator appears subject to this conflicts of interest prohibition. With respect to your specific question concerning his receipt of salary payments from MECA, as I have stated above, I do not perceive a conflict per se as a consequence of such payments. I do note, however, that the Agreement contemplates the MECA Commission's input with respect to budgetary matters. Agreement, supra, at Arts. 5 and 8. This suggests that the Commission may have some decision-making authority with respect to the coordinator's salary. Whether any particular decision would impact upon the coordinator's personal interests to an extent that he would be required to refrain from participating in the decision-making is entirely a question of fact, requiring consideration of the issue(s) involved and how directly the decision impacts his personal interests. I can only note that as a voting member of the Commission, the coordinator must be cognizant of the need to avoid a conflict between his interests as coordinator and his duties as a MECA commissioner. He should also be mindful of A.C.A. § 14-14-1202(a)(3) (Supp. 2005), a section of the County Code providing that a county officer or employee "may not use his office, the influence created by his official position, or information gained by virtue of his position to advance his individual personal economic interest . . . other than advancing strictly incidental benefits as may accrue . . . from the enactment or administration of law affecting the public generally." The application of this statute similarly depends upon the facts of each particular situation.
With regard to any other potential conflict of interest issue, I believe it is necessary to consider whether the OES coordinator's membership on the MECA Commission violates any of the three possible types of legal prohibitions against the concurrent holding of two offices that have been identified by the Arkansas Supreme Court: constitutional prohibitions, statutory prohibitions, and, if no constitutional or statutory prohibition applies, the common-law prohibition known as the "doctrine of incompatibility." Byrd v. State, 240 Ark. 743, 744-45,402 S.W.2d 121 (1966). I have found no constitutional or statutory provision that would prevent the coordinator's service on the Commission. A question remains, however, regarding the common law prohibition. As described by the Court, the "inconsistency, which at common law makes offices incompatible" exists in situations when "one is subordinate to the other, and subject in some degree to the supervisory power of its incumbent, or where the incumbent of one office has the power to remove the incumbent of the other or to audit the accounts of the other." Tappan v. Helena Fed.Savings Loan Assn., 193 Ark. 1023, 1024, 103 S.W.2d 458
(1937). Accord Thompson v. Roberts, 333 Ark. 544,970 S.W.2d 239 (1998). The Court in Thompson further expounded upon the incompatibility doctrine by stating:
 One commentator has explained, `Incompatibility arises, therefore, from the nature of the duties of the offices, when there is an inconsistency in the functions of the two, where the functions of the two are inherently inconsistent or repugnant, as where the antagonism would result in the attempt by one person to discharge the duties of both offices, or where the nature and duties of the two offices are such as to render it improper from considerations of public policy for one person to retain both. Eugene McQuillin, 3 The Law of Municipal Corporations § 12.67 (3d ed. 1990).
333 Ark. at 549.
In Thompson, the Court held that the dual service of a mayor as part-time bookkeeper for a city of the second class violated the doctrine of incompatibility and a statute (A.C.A. § 14-42-107).Id. at 549-50. As one of my predecessors observed, the position of bookkeeper in that case obviously did not meet the judicial criteria for an "office," which usually involves the exercise of sovereign power in some measure, as well as such factors as the taking of an oath of office, the receipt of a formal commission, and the giving of a bond. Ark. Op. Att'y Gen. 1998-108; Maddoxv. State, 220 Ark. 762, 249 S.W.2d 972 (1952). Accordingly, although previous Attorney General's opinions had concluded that the holding of two offices, as opposed to the holding of one office and one employment, is a necessary prerequisite to the applicability of the incompatibility doctrine, this office has since focused on the potential "antagonism" between two positions, and whether service in both capacities is "repugnant" in the sense discussed in Thompson, supra. Ark. Ops. Att'y Gen. Nos. 2003-371 (concluding that question whether dual service as city recorder/treasurer and hourly employee of the mayor is barred by the incompatibility doctrine is a question of fact).See also 1999-052 (relying on Thompson to opine that a mayor could not simultaneously serve as a city employee) and 1998-108 ("Any inherent exercise on the part of the City Recorder of supervisory power over the `water clerk' position will lead to [an unlawful conflict of interest].").
Bearing in mind this discussion of the common law incompatibility doctrine, I note that the MECA Commission was established as a "joint board" pursuant to the statute governing interlocal agreements, which requires that such agreements provide for "an administrator or joint board responsible for administering the joint or cooperative undertaking including representation of the contracting parties on the joint board[.]" A.C.A. §14-14-910(c)(3)(F). Although the Agreement states that the Commission members "serve by virtue of their term in office or employment with local government[,]" I gather from § 14-14-910
that the Commission is nevertheless a distinct body. Consistent with the above discussion, therefore, I believe it is necessary to consider whether the OES coordinator's service on the Commission is foreclosed by the incompatibility doctrine.
Having undertaken that analysis, I must conclude that no definitive answer is possible because it is unclear precisely what authority the Commission exercises pursuant to the Agreement. As I observed above, the Agreement charges the Commission with assuring that MECA is properly funded. Yet it does not specify how the Commission is to provide this assurance. The Commission provides "input . . . concerning any and all relevant budgetary matters." Agreement at art. 6. I note, however, that according to the Agreement, "[t]he Pine Bluff City Council and the Jefferson County Quorum Court along with the 911 Administrative Board shall be responsible for financing the operation of the [911 Public Safety Communications Center. . . ."Id. This suggests that the Commission may serve more of an advisory role concerning financing matters. The Commission's purpose is also "to establish policies and procedures and adopt necessary guidelines for efficient operation of the system."Id. at art. 5. This would have implications for the "incompatibility" determination if it were established that the Commission had enforcement authority in this regard. But this is also unclear under the Agreement. A similar observation must be made with respect to the OES coordinator's duty, as "Director" (see above discussion) to "render reports and make necessary appearances before the Commission, the 911 Administrative Board, the Pine Bluff City Council, and the Jefferson County Quorum Court." Id. at art. 8.5. The Agreement does not define the purpose of these reports and appearances. Nor does it delineate the Commission's authority in respect thereto.
I am unable for the foregoing reasons to state whether serving as OES coordinator results in antagonism or is inherently inconsistent with the duties of MECA commissioner such that the dual service would be barred. It is unclear whether the coordinator's membership on the Commission places him in a position where he is effectively supervising himself or auditing the system finances such that he is in effect auditing himself. These are relevant issues, in my opinion, for purposes of the "incompatibility" doctrine, which determines whether the dual service is prohibited altogether. The general common law conflicts of interest policy, discussed above, may also impact some aspects of the dual service. If the particular facts of a situation would divide his allegiance between his duties as OES coordinator and MECA Commission member, the coordinator should abstain from participation in any decision-making that would require him to act in the interest of one position at the expense of the other.
Question 2 — If so, can this be cured by the OES coordinator refraining from voting on any matter that would benefit him monetarily?
See discussion above.
Question 3 — Does A.C.A. § 14-42-107 affect his ability to sit as a board member?
No. This conflicts of interest statute applies to aldermen and other municipal officials and employees. The OES coordinator's position as an officer or employee of the county office of emergency services clearly falls outside this provision. I realize that the coordinator's salary is paid in part by funds that may be contributed by a municipality, and that he was named by, among others, municipal officials to manage the system as "Communications Director." However, I do not believe this constitutes him a municipal official or employee under §14-14-107. A similar section of the County Code, which I noted above when discussing relevant conflicts of interest proscriptions, does, however, apply to the OES coordinator, in my opinion. See A.C.A. 14-14-1202.
Assistant Attorney General Elisabeth A. Walker prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:EAW/cyh
[1] These provisions of the Public Safety Communications Act are mirrored in the Arkansas Emergency Services Act, wherein it provides:
 When authorized by the chief executive of the political subdivision and properly staffed, the local office of emergency services may operate a public safety communications center for the purposes of coordination, dispatch, and information services for local government public safety agencies and private or volunteer agencies with an emergency service mission.
 The public safety communications center must be staffed by paid office of emergency services public safety officers of the political subdivision and operate on a continuous basis if it is to serve as a law enforcement or fire dispatch and service center.
A.C.A. § 12-75-118(j)(2)(A) and (B).